UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| STEVEN DEAN SHANK, | ) | |
| --- | --- | --- |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO. 1:16-cv-00184-SLC |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | |
| Defendant. | ) ) | |

## OPINION AND ORDER

Plaintiff Steven Dean Shank appeals to the district court from a final decision of the Commissioner of Social Security ("the Commissioner") denying his application under the Social Security Act (the "Act") for disability insurance benefits ("DIB").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Shank applied for DIB in January 2013, alleging disability as of August 25, 2007. (DE 9 Administrative Record ("AR") 129-35). He was last insured for DIB on March 31, 2014 (AR 20);[2] therefore, he must establish that he was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that he was disabled as of his date last insured in order to recover DIB benefits).

---

[1] All parties have consented to the Magistrate Judge. (DE 13); *see* 28 U.S.C. § 636(c).

[2] Some records list Shank's date last insured as December 31, 2013. (*See, e.g.*, AR 145, 164). However, the ALJ refers in his decision to March 31, 2014, as the date last insured. (AR 24).

The Commissioner denied Shank's application initially and upon reconsideration. (AR 65, 74). A hearing was held on October 6, 2014, before Administrative Law Judge Steven Neary ("the ALJ"), at which Shank, who was represented by counsel, and a vocational expert, Sharon Ringenberg (the "VE"), testified. (AR 33-57). On November 17, 2014, the ALJ rendered an unfavorable decision to Shank, concluding that he was not disabled because he could perform a significant number of light exertional jobs in the economy despite the limitations caused by his impairments. (AR 18-27). The Appeals Council denied Shank's request for review (AR 1-4), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Shank filed a complaint with this Court on May 26, 2016, seeking relief from the Commissioner's final decision. (DE 1). Shank alleges two material flaws in the decision: (1) that the ALJ improperly discounted the opinion of Dr. Bacchus, a physician who examined Shank at the request of the Social Security Administration; and (2) that the ALJ improperly discounted Shank's symptom testimony. (DE 14 at 3-9).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Shank was 50 years old (AR 129); had completed high school and a welding training program at Ivy Tech (AR 149); and had worked for 22 years as a water softener servicer for Culligan (DE 26, 36, 201). Shank alleges disability due to "[o]steoarthritis, hip replacement, back injury, femur break[, and] back pain." (AR 148).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 444-page administrative record necessary to the decision.

### A. *Shank's Testimony at the Hearing*

At the hearing, Shanks testified as follows: He is married and performs his self care independently. (AR 36, 40). He is approximately six feet tall and weighs 240 pounds. (AR 35-36). He stopped working at Culligan seven years earlier when he had a hip replacement. (AR 36). He spends his days caring for elderly relatives in that he drives them to appointments and helps them with light housework; he also works in the garden. (AR 40). Shank attends church, is president of a local tractor club, and is a member of the Lion's Club. (AR 41, 50). Shank is also on the township advisory board, which meets several times a year. (AR 50). Shank used to have a commercial driver's license to drive the church bus, but he had not renewed that license in the last two years. (AR 42).

When asked why he thought he could not work, Shank stated that he has to move around and cannot sit for long periods of time due to intermittent, stabbing pain in his low back that extends into his legs. (AR 37-38). His pain is aggravated by sitting on a folding metal chair and is alleviated by lying down. (AR 38). He uses a cane when he walks farther than a block. (AR 38-39). He can stand for five minutes before needing to sit down, and he can sit for about 45 minutes at a time, shifting positions frequently. (AR 39-40, 44-45). He can lift a gallon of milk from the ground, but bending over is difficult for him. (AR 39-40; 44-46). He cannot lift 20 pounds from the ground frequently, but he can lift 40 pounds from a tabletop. (AR 39-40, 44-46). Shank has about four or five bad days a month where he spends most of the day sitting in a soft chair or reclining on the couch. (AR 46-47).

Shank was not currently taking prescription pain medication or receiving any treatment; he takes ibuprofen when going out for an extended period or if he feels his pain is "bad enough

3

to take it." (AR 38, 48). Shank gave several reasons why he does not take prescription pain medication: (1) because he drives his elderly relatives to appointments; (2) because he has taken prescription pain medication such as Vicodin and Tramadol in the past and had difficulty getting off of them; (3) he is concerned about long term side effects to his kidney and other organs; and (4) he had a hard time concentrating while on Vicodin. (AR 42-43, 48-49). Shank's doctor told him that when his pain is severe enough, he "will know it" and that he should then undergo a lumbar fusion. (AR 41). His doctor does not want to operate now due to Shank's young age because it would affect his mobility, and Shank feels that he needs to stay mobile to help care for his elderly relatives. (AR 41-43).

### B. *Summary of the Relevant Medical Evidence*

In 1983, Shank fractured his left femur in a motorcycle accident. (AR 213, 220, 372). He underwent an open reduction and internal fixation with placement of an intramedullary rod. (AR 209, 220, 372).

In 2007, Shank complained of severe pain in his left hip, knee, and groin; his left hip range of motion was significantly decreased. (AR 216, 368, 374, 377). Imaging studies revealed a narrowing of his left hip joint space and a medial meniscal tear of his left knee. (AR 209, 213, 216, 368). After conservative treatment failed to alleviate his symptoms, Shank underwent a left knee arthroscopy and partial medial meniscectomy on May 30, 2007, and a total left hip arthroplasty on August 29, 2007. (AR 215-19, 355, 363-66). Shank participated in physical therapy through late November 2007. (AR 234-39, 309).

After his hip replacement, Shank began experiencing low back pain that radiated down his legs bilaterally. (AR 212, 241, 243, 246, 263, 300-02, 386, 393). An MRI of his lumbar

spine in October 2008 revealed disc bulges without significant spinal stenosis at the L3-L4, L4-5, and L5-S1 levels. (AR 393-94). Shank was diagnosed with lumbar degenerative disc disease, radiculopathy, and lumbar facet syndrome. (AR 251). He underwent bilateral nerve root blocks at the S1 level of his lumbosacral spine in December 2008. (AR 246-48).

On January 14, 2009, Shank was referred to Dr. Robert Shugart, an orthopedic surgeon at Fort Wayne Orthopaedics, L.L.C., for consultation regarding surgical options. (AR 250). Dr. Shugart observed that Shank's recent MRI "really looks good" in that he had "a little bit of bulging but overall, well maintained." (AR 264). He had some facet arthropathy too, but no significant central foraminal or later recess stenosis. (AR 264). Dr. Shugart recommended that Shank have a discogram performed, and Shank did so on March 31, 2009. (AR 255-58, 264). The discogram revealed "discogenic low back pain with concordant reproduction of pain at the L5-S1 level with abnormal nucleogram demonstrating posterior central annular tear extending to the outer one-third of the annulus." (AR 255-58).

On April 15, 2009, Shank returned to Dr. Shugart, and a physical exam was unchanged. (AR 261). They discussed surgery, and Shank was to talk it over with his wife. (AR 261). On July 7, 2009, Dr. Shugart noted that Shank still had severe pain and that he did have some stenosis. (AR 259). A physical exam was unchanged. (AR 259). Dr. Shugart recommended that Shank undergo an interbody lumbar fusion at the L5-S1 level because of the foraminal stenosis at Shank's L4-5 and L5-S1 levels. (AR 259). Dr. Shugart stated that he explained the surgery, the risks, and the post operative course to Shank, and that "[o]nce authorized we will proceed." (AR 259). Dr. Shugart noted that the patient consents were signed, but that insurance approval was needed before scheduling the surgery. (AR 260). The surgery, however, never

5

took place.  (*See, e.g.*, AR 400).

On May 10, 2012, Shank saw Dr. John Williams at Ortho Northeast for complaints of a five-year history of intermittent low back pain.  (AR 296-97).  His pain ranged from a two to an eight on a 10-point scale; activity and rest relieved his pain, and sitting and standing worsened it.  (AR 296).  A straight leg raise on the left was positive for radicular pain; muscle strength and reflexes were normal.  (AR 296-97).  Light touch sensation was diminished in the lateral calf and superior foot.  (AR 296).  Dr. Williams's impression was that Shank had left sciatica, and he recommended that Shank perform "activity as tolerated."  (AR 297).

Shank returned to Dr. Williams a week later, describing his intermittent back pain as "dull" and rating it as a four to five on a 10-point scale.  (AR 293).  Shank was experiencing muscle spasms in the lumbar spine; other clinical findings were similar to his prior visit.  (AR 293).  An MRI showed mild degenerative disc disease; a disc bulge at L3-L4 and mild disc bulges at L4-L5 and L5-S1; mild facet hypertrophy; and no significant central canal stenosis, but mild foraminal stenosis at L4-L5.  (AR 295).  Dr. Williams's impression was lumbar degenerative disc disease, lumbar herniated/ruptured disc, left sciatica, and low back pain.  (AR 293).  Dr. Williams referred Shank for epidural injections and physical therapy, and recommended that he perform activity as tolerated.  (AR 294).  After discussing various options, Shank elected to see a physiatrist for pain management services.  (AR 294).

On May 22, 2012, Shank visited Dr. Jeffrey Barr at Ortho Northeast for a consultation about his back condition.  (AR 290).  He complained of intermittent, stabbing, achy pain, which he rated as a five.  (AR 290).  He was not taking any pain medication; activity worsened his pain, and rest made it better.  (AR 290).  His spinal range of motion was limited by lumbar pain; a

6

straight leg test was negative bilaterally, but a Spurling test was positive on the right. (AR 291). Dr. Barr prescribed Tramadol. (AR 291).

Shank returned to Dr. Barr on July 17, 2002, complaining of sharp, achy back pain which occurred intermittently and ranged from a two to a seven. (AR 288). He was not taking any pain medication; the pain reduced with rest and worsened with activity. (AR 288). Shank stated that the Tramadol caused him dizziness, and Dr. Barr recommended that he try it at nighttime for a few days, and then try it in the daytime to see if he tolerated it better. (AR 288). Shank stated that he was not interested in taking any stronger medications. (AR 288). His gait was normal. (AR 289).

On April 3, 2013, Shank was evaluated by Dr. H.M. Bacchus at the request of the Social Security Administration. (AR 400-02). Shank reported that he was told to have back surgery, but that his mobility would decrease further if he did. (AR 400). Shank stated that he had no plans to let them operate on his back. (AR 400). On exam, Shank's gait and station were slightly antalgic on the left. (AR 401). He could hop on his right foot but not on the left, walk on heels and toes, tandem walk, and squat one-third way down. (AR 401). He could move on and off of a chair without difficulty. (AR 401). His muscle strength and tone were 5/5 in all extremities. (AR 401). Dr. Bacchus's impression was history of left femur open reduction internal fixation, recovered; history of left hip total arthroplasty, functioning well, though no imaging for review; history of degenerative disc disease of L3-4, L4-5, and L5-S1, though no current imaging to review; secondary chronic lower back pain post surgery, previously treated with no relief; and hyperlipidemia treated with medication. (AR 401). Dr. Bacchus concluded that Shank maintained the physical capacity "to perform 6-8 hours of light duties with non-

continuous sitting[,] standing or walking and limited lifting of no more than 10 lbs." (AR 401).

On April 17, 2013, Dr. A. Dobson, a state agency physician, reviewed Shank's record. (AR 61-63). Dr. Dobson concluded that Shank could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid unprotected heights. (AR 61-62). On June 12, 2013, Dr. M. Brill, another state agency physician, reviewed Shank's record and reached the same conclusions as Dr. Dobson. (AR 70-72).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On November 17, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 18-27). At step one, the ALJ concluded that Shank had not engaged in substantial gainful activity after his alleged onset date of August 25, 2007, through March 31, 2014, his date last insured. (AR 17). At step two, the ALJ found that Shank had the following severe impairments as of his date last insured: lumbar spine degenerative disc disease; a history of a fractured left femur, status post open reduction internal fixation; degenerative osteoarthritis of the left hip, status post left hip total arthroplasty; chronic obstructive pulmonary disease; and obesity. (AR 20).

At step three, the ALJ concluded that Shank did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 22). Before proceeding to step four, the ALJ determined that Shank's symptom testimony was "not entirely credible" (AR 26), and assigned him the following RFC as of his date last insured:

> [T]he claimant has the [RFC] to perform light work . . . except that he is limited to no more than occasional climbing, crouching, crawling, kneeling or stooping. Additionally, the claimant is limited to no concentrated exposure to pulmonary irritants, such as dust, fumes or chemicals.

(AR 22). The ALJ found at step four that Shank could not perform his past relevant work. (AR 26). At step five, based on the assigned RFC and the VE's testimony, the ALJ concluded that as of his date last insured Shank could perform a significant number of light exertional jobs in the economy, including cashier, retail marker, and hand packager. (AR 27). Therefore, Shank's application for DIB was denied. (AR 27).

### C. The ALJ's Consideration of Dr. Bacchus's Opinion Is Not Supported by Substantial Evidence

Shank argues that the ALJ failed to properly evaluate the opinion of Dr. Bacchus, a physician who examined him in April 2013 at the request of the Social Security Administration. To review, Dr. Bacchus concluded that Shank could "perform 6-8 hours of light duties with non-continuous sitting[,] standing or walking and limited lifting of no more than 10 lbs." (AR 401). Shank's argument has merit, as the ALJ's explanation for the weight applied to Dr. Bacchus's opinion is not sufficiently articulated or supported by substantial evidence. (AR 25).

The ALJ must "evaluate every medical opinion [he] receive[s]." 20 C.F.R. § 404.1527(c). Each medical opinion, other than a treating physician's opinion entitled to controlling weight, must be evaluated pursuant to factors articulated in 20 C.F.R. § 404.1527(c) to determine the proper weight to apply to it. *See* 20 C.F.R. § 404.1527(c); *see generally White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005). Whether the doctor examined the claimant is one of the factors considered when weighing opinions under this regulation. *Payne v. Colvin*, No. 4:15-CV-43-JVB-PRC, 2017 WL 655863, at *2 (N.D. Ind. Feb. 17, 2107) (citing 20 C.F.R. § 404.1527(c)(1)). Medical opinions from examining sources are generally given more weight than those from non-examining sources." *Id.* (citing 20 C.F.R. § 404.1527(c)(1)). The Seventh

11

Circuit Court of Appeals has stated that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citation omitted); *see Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (noting that the circumstance presented was "not a case where the ALJ improperly rejected an examining physician's opinion in favor of a non-examining physician's decision").

Here, after considering Dr. Bacchus's opinion, the ALJ chose to assign the opinion "little" weight. (AR 25). In doing so, the ALJ explained: "The undersigned gave this opinion little weight . . . because it is not consistent with his own observations, it appears to be based upon the claimant's subjective complaints, as well as not being supported by the clinical and diagnostic evidence as described above." (AR 25). The ALJ then elected to assign "great" weight to the opinions of Drs. Dobson and Brill, the non-examining state agency physicians. (AR 25-26, 63, 71).

Shank argues that the ALJ's proffered rationale for discounting Dr. Bacchus's opinion lacks the necessary specificity and support of the record. More particularly, Shank contends that the ALJ failed to identify any actual inconsistencies between Dr. Bacchus's opinion and the clinical findings that he documented at the consultative examination. *See Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995) ("The ALJ must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." (citations omitted)).

Indeed, it is unclear what portion of Dr. Bacchus's opinion the ALJ viewed as inconsistent, as the ALJ does not point to any actual inconsistency. The Commissioner suggests

that Dr. Bacchus's limitation to non-continuous sitting, standing, or walking—in essence, to alter positions with some frequency—is inconsistent with his examination findings that Shank demonstrated only a slightly antalgic gait on the left, did not require an assistive device, could walk on his heels and toes, could tandem walk, and had normal leg strength. (DE 19 at 11). However, while that argument addresses Shank's ability to walk during the exam, it does not address his ability to perform *prolonged* walking, standing, or sitting—all which Shank identified to be problems that prevent him from working. Shank explained that prolonged walking, standing, or sitting causes his low back pain to intensify. (*See* AR 37-39 ("I can't sit for long periods of time, and I have to move around. . . . Because it hurts in the lower back down the back of my legs.")). Nothing in Dr. Bacchus's findings undermines his conclusion that Shank has problems with continuous sitting, standing, or walking. (*See* AR 400-01); *see Gerstner v. Berryhill*, — F.3d —, 2018 WL 298803, at *5 (7th Cir. Jan. 5, 2018) (finding that an examining doctor's findings that the claimant could sit, move, and walk for an unstated period of time in one exam was not inconsistent with the claimant's complaints of pain triggered by prolonged sitting, standing, or activity).

Furthermore, the Commissioner seems to be "playing doctor" by suggesting *post hoc* that Shank's normal muscle strength in his legs is somehow inconsistent with his experiencing chronic back pain. *See, e.g.*, *Lanzi-Bland v. Berryhill*, No. 16 C 8856, 2017 WL 4797529, at *4 (N.D. Ill. Oct. 24, 2017) (remanding case where the ALJ seized upon the doctor's documentation indicating that the claimant consistently presented with normal gait and strength, yet the ALJ offered no discussion as to how these findings were inconsistent with the doctor's conclusions about the claimant's work abilities and limitations). Indeed, a finding of normal muscle strength

13

in Shank's legs does not automatically undermine Dr. Bacchus's opinion that Shank needed to be able to alternate positions with some frequency. *See, e.g.*, *id*.

Shank also argues that the ALJ failed to support his assertion that Dr. Bacchus appeared to have based his findings on Shank's subjective complaints, rather than clinical and diagnostic evidence. But in his report, Dr. Bacchus observed that Shank weighed 250 pounds; had undergone a left hip replacement due to osteoarthritis; had degenerative disc disease of L3-4, L4-5, and L5-S1 and was told to have surgery; and had undergone steroid injections and pain management care with no relief. (AR 400-01). Dr. Bacchus further observed that Shank's gait and station were slightly antalgic on the left, that he could not hop on the left, and that he had some limitations in range of motion in his left hip. (AR 401-02). As such, the ALJ's conclusion that Dr. Bacchus based his opinion on Shank's subjective complaints, without any elaboration, seems speculative, particularly considering that Dr. Bacchus evaluated Shank at the request of the Social Security Administration.

Moreover, in weighing the medical source opinions, the ALJ stated that he was "was without the benefit of any statement from [Shank's] treating physician regarding any functioning limits." (AR 25). But that is not entirely accurate. In May 2012, Shank's treating specialist, Dr. Williams, wrote on two separate visits that Shank should perform "activity as tolerated." (AR 294, 297). This reasonably suggests that Dr. Williams believed that Shank's pain level should guide him in how much activity he performs.

Furthermore, it is significant in this instance that the opinions of the state agency physicians are quite similar to Dr. Bacchus's opinion, except in just two respects. First, the state agency physicians found that Shank could lift 10 pounds frequently and 20 pounds occasionally,

where Dr. Bacchus opined that Shank could lift a maximum of 10 pounds. (*Compare* AR 61-62, 70-71, *with* AR 401). Second, the state agency physicians found that Shank could sit, stand, or walk for six hours in an eight-hour workday, where Dr. Bacchus opined that Shank could perform six to eight hours of "non-continuous" sitting, standing, or walking. (*Compare* AR 61-62, 70-71, *with* AR 401). While these differences between the opinions may appear minimal at first glance, the differences in this particular instance are pivotal.

To explain, the VE testified at the hearing that a hypothetical individual with Shank's RFC who also "would need to sit or stand at least twice an hour with a five-minute interval in between the position changes where [he is] moving about away from the work station to relieve pain" could not maintain competitive employment because "that would be too much time off task." (AR 54). The VE further testified that if this same individual had to alternate between sitting and standing every 15 minutes but did not need to leave his work station, he still would have "too much time off task" and could not maintain competitive employment. (AR 54-55). Considering the VE's testimony, the difference between the ALJ adopting Dr. Bacchus's limitations, which included the need to alternate positions with some regularity, and the state agency physicians' limitations, which did not include the need to alternate positions, is not mere harmless error. *See Schramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination). The Court is hard-pressed to understand how Dr. Bacchus's additional limitation of the need to alternate positions with some frequency is somehow inconsistent with Dr. Bacchus's examination findings, the objective medical evidence, or Shank's medical history of

degenerative disc disease.[5]

In sum, medical opinions from an examining physician are generally given more weight that those from non-examining physicians. *Payne*, 2017 WL 655863, at *2 (citing 20 C.F.R. § 404.1527(c)(1)). The reasons provided by the ALJ for assigning "little" weight to the opinion of Dr. Bacchus, who examined Shank, and for assigning "great" weight to the non-examining opinions of Drs. Dobson and Brill, are not adequately explained or supported by the record. *See Gudgel*, 345 F.3d at 470 ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." (citations omitted)). Consequently, the ALJ's decision will be remanded. Upon remand, the ALJ is to reconsider the medical source opinions of record and minimally articulate his rationale for the weight he assigns to the opinions, offering specific reasons that are grounded in the record.[6]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED for further proceedings in accordance with this Opinion. The Clerk is directed

---

[5] Also, while the ALJ acknowledged that Shank's obesity "would exacerbate his low back pain by diminishing his ability to perform basic exertional activities such as sitting, standing, lifting and walking" (AR 25), the ALJ failed to explain how he actually accounted for Shank's obesity when assigning the RFC.

[6] Because a remand is warranted for reconsideration of the medical source opinions, the Court need not reach Shank's remaining argument.

to enter a judgment in favor of Shank and against the Commissioner.

SO ORDERED.

Entered this 16th day of January 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge